## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

No. 5:08-CV-00438-FL

| | |
|---|---|
| MOHAMMED LEBYED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **MEMORANDUM** |
| | ) **& RECOMMENDATION** |
| | ) |
| DTG Operations, Inc. | ) |
| | ) |
| Defendant. | ) |

This matter is before the Court on Defendant DTG Operations, Inc.'s ("DTG")
Motion to Dismiss [DE-43] and pro se Plaintiff Mohammed Lebyed's response [DE-46].
In addition, Defendant filed a Motion for Summary Judgment [DE-48] and Plaintiff
responded [DE-55]. These matters are now ripe for ruling. Because the former may
render moot issues in the latter, the Court addresses them separately, in turn.

## I. Motion to Dismiss

### A. Procedural and Factual Background

On May 13, 2008, Plaintiff filed a charge of discrimination with the Equal
Employment Opportunity Commission ("EEOC") in Raleigh, North Carolina, alleging
discrimination on the basis of race and national origin [DE-46, Ex. B]. On June 2, 2008,
the EEOC sent Plaintiff a letter dismissing his case and notifying him of his right to sue
pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") within 90 days from
receipt of the letter [DE-46, Ex. A]. On August 28, 2008, 85 days after receiving his
EEOC notice of right to sue letter, Plaintiff filed a motion requesting leave to proceed in

forma pauperis. [DE-43.] On September 3, 2008, the Court granted Plaintiff leave to proceed in forma pauperis and at the same time filed his complaint, which alleged claims of discrimination on the basis of national origin, race and religion pursuant to Title VII against Andrew Burks, Plaintiff's former manager at DTG (an affiliate of the Dollar Thrifty Automotive Group ("DTAG")).

On December 10, 2008, Burks filed a motion to dismiss the complaint for failure to state a claim, arguing that he was listed improperly as the defendant. The motion was granted on June 10, 2009, and Plaintiff was instructed to amend the complaint within 20 days to include the proper defendant. [DE-14, 24.] On June 25, Plaintiff filed an amended complaint, which listed DTAG as the defendant [DE-29], and voluntarily dismissed Burks [DE-32]. On July 7, Defendant's counsel accepted service of the amended complaint and informed Plaintiff that DTG, not DTAG, was the proper defendant. Two days later, DTAG filed a motion to substitute party defendant. [DE-35.] The motion was granted on July 16, 2009. [DE-39.] Defendant filed the Motion to Dismiss on July 21, 2009. [DE-43.] Defendant argues that Plaintiff's complaint should be dismissed because it was filed after the statutory deadline and because Plaintiff failed to exhaust all administrative remedies with respect to the religious discrimination claim.

## B. Discussion

### 1. Motion to Dismiss Standard

A motion to dismiss under 12(b)(6) tests the sufficiency of the facts pleaded in the complaint. It determines whether a claim is stated; it does not resolve issues of disputed facts, the merits of a claim, or the applicability of defenses. Republican Party

2

v. Martin, 908 F.2d 943, 952 (4th Cir. 1992). When reviewing a motion to dismiss, the Court considers the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations. Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994). Generally, if a court considers matters outside the complaint in ruling on a motion to dismiss, the motion is treated as one for summary judgment under Fed. R. Civ. P. 56. Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985). However, a court may consider "official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint, so long as the authenticity of these documents is not disputed," without converting the motion to dismiss into a motion for summary judgment. Witthohn v. Fed. Ins. Co., 164 Fed. Appx. 395, 396-97 (4th Cir. 2006).

Plaintiff did not attach his original EEOC claim letter to his complaint. He did file the letter with his response to the Motion to Dismiss (Pl.'s Resp., Ex. A), and the letter is explicitly referenced in Plaintiff's complaint. Further, courts have a duty to "interpret charitably" pleadings filed by pro se litigants. Haines v. Kerner, 404 U.S. 519, 520 (1972). Therefore, the Court will consider this exhibit without converting the instant motion into one for summary judgment. See Spain v. Va. Commonwealth Univ., No. 3:9cv266, 2009 U.S. WL 2461662, at *3 (E.D. Va. Aug. 11, 2008) (concluding that a motion to dismiss should not be converted into a motion for summary judgment when a plaintiff explicitly referenced the filing of EEOC charges in her amended complaint).

## 2. Timeliness of the Filing

Title VII provides that an employee must file a civil action within 90 days of receiving of right to sue letter from the EEOC. 42 U.S.C. § 2000e-5(f). When a litigant fails to file an action in the requisite time period, a statute of limitations defense may

3

permissibly be raised in a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Pantry Pride Enters., Inc. v. Glenlo Corp., 729 F.2d 963, 965 (4th Cir. 1984). The limitations period is subject to equitable tolling. See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1972) (holding that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling"). But the mere fact that a plaintiff is proceeding pro se does not mandate tolling should he fail to comply with the statutory requirements. Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1984).

In this case, Plaintiff submitted his complaint along with his application to proceed in forma pauperis within the 90-day limit. On June 2, 2008, the EEOC sent Plaintiff a right to sue letter, which he received on June 4, 2008. See Am. Compl. at 3 [DE-29]. Eighty-five days later, on August 28, 2008, Plaintiff filed his motion to proceed in forma pauperis. The Court took six days to process Plaintiff's application, granting the motion and filing the complaint on September 3, 2008, one day after the 90-day deadline.

Although equitable tolling should not be applied indiscriminately, it is the Court's opinion that the filing statute should be equitable tolled in this instance. Plaintiff should not be penalized under the filing statute because the Court's internal process took six days to consider his in forma pauperis application, rendering the filing of his complaint outside the 90-day window. See Truesdale v. Potter, No. 1:01CV00427, 2003 WL 1522945, at *4 (M.D.N.C. March 24, 2003) (holding that the filing statute should be equitably tolled because the plaintiff filed his complaint and application to proceed in

4

forma pauperis within the 90 day window, but the court did not process and file the plaintiff's complaint until after the deadline). When a complaint is attached to a pro se motion to proceed in forma pauperis and the motion is timely filed, the complaint should be viewed as having been filed on the date of the plaintiff's motion. Vinson v. Richmond Police Dep't, 567 F.2d 263, 263 n.2 (4th Cir. 1977) (vacated on other grounds); see also Martin v. Richmond Police Dep't, No. 3:08cv849, 2009 WL 2232753, at *11 (E.D. Va. July 21, 2009).

The Court notes that in some instances other courts have refused to toll the limitations period when plaintiffs have failed to actively pursue their claims. See Westfield v. Rhodes-Perdue Furniture Co., 109 F.R.D. 106, 107 (W.D.N.C. 2003) (holding that tolling was inappropriate where the request to proceed in forma pauperis (with complaint attached) was filed on day 88 of 90, the request was not approved for an additional 17 days, the defendant received notice of the suit 26 days after the limitations period expired, which constituted unfair prejudice in the eyes of the court, and where the Plaintiff had not been diligent in pursuing his rights, including naming the wrong defendant altogether at first and wholly disregarding one of the court's orders in the action). Defendant argues that Plaintiff in this case has not diligently pursued this action because he failed to amend his federal complaint to name the proper defendant in spite of the fact that he correctly amended his state court complaint to include the correct party. The Court does not agree that Plaintiff has failed to diligently pursue his rights.

Here, Plaintiff has proceeded pro se. Accordingly, the fact that he did not initially file his complaint naming the correct Defendant does not establish a failure to pursue

5

the action. Moreover, although Plaintiff named the proper defendant in his state court action, he was represented by counsel in that case. Def.'s Mot. at 2 n.1. Further, although Plaintiff initially named the wrong defendant, all defendants are either employees or corporate affiliates of the proper Defendant, providing for sufficient notice.

Because Plaintiff timely filed his application to proceed in forma pauperis and his complaint within the 90-day time limit, and because he has actively pursued this action, the Court concludes that Plaintiff's complaint was timely filed.

### 3. Failure to Exhaust Administrative Remedies.

Before bringing a discrimination claim under Title VII, a plaintiff must first file a discrimination charge with the EEOC. The EEOC claim determines the scope of the plaintiff's right to bring the subsequent Title VII action. See, e.g., Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002); see also Webb v. N.C. Dep't of Crime Control and Public Safety, Alcohol Law Enforcement Div., No. 7:08-CV-90-D, 2009 WL 3150266, at *5 (E.D.N.C., Sept. 11, 2009). More specifically, "only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." Evans v. Techs. Applications & Servs. Co., 80 F.3d 954, 963 (4th Cir. 1996). The rationale for the exhaustion requirement in this context is that it provides notice to employers of alleged discrimination and helps encourage agency-monitored settlement. Chacko v. Patuxent Institution, 429 F.3d 505, 510 (4th Cir. 2005). Failure to exhaust administrative remedies in an EEOC action deprives a court of subject matter jurisdiction over the claim. Jones v. Calvert Group, Ltd, 551 F.3d 297, 300 (4th Cir. 2009).

6

The Fourth Circuit takes a narrow approach to determining when claims are "reasonably related" to or "developed by reasonable investigation of" the original complaint. Evans, 80 F.3d at 963. For example, the Fourth Circuit recently made clear that if the EEOC charge alleges discrimination on one basis and the federal action alleges discrimination on a separate basis, that separate federal claim will generally be barred. Jones, 551 F.3d at 300. The Fourth Circuit is equally reluctant to allow plaintiffs to expand the alleged adverse employment actions beyond the allegations stated in the original EEOC complaint. Chako, 429 F.3d at 509; see also Collins v. TIAA-CREF, No. 3:06cv304-RJC, 2009 WL 3077555, at *4 (W.D.N.C. Sept. 23, 2009) (dismissing the Title VII discrimination claims not referenced in the plaintiff's EEOC complaint as the plaintiff failed to exhaust administrative remedies with respect to them).

Plaintiff properly filed an EEOC claim stating discrimination on the basis of race and national origin. In the "particulars" section, Plaintiff stated: "I believe that I was discriminated against in violation of Title VII of the Civil Rights Act of 1964, as Amended, because of my race, Arabic, and my national origin, Morocco, North Africa." Def.'s Mot., Ex. B. The EEOC claim does not mention religious discrimination and the "Religion" box is not checked. Plaintiff did not file a later EEOC charge on the basis of religious discrimination.

The Court concludes that Plaintiff has failed to exhaust his administrative remedies with respect to the Title VII religious discrimination claim. Jones, 551 F.3d at 300.

## II.    Summary Judgment

### A. Procedural and Factual Background

7

The facts, stated in the light most favorable to Plaintiff, are as follows: DTG is a rental car company headquartered in Tulsa, Oklahoma that operates rental car facilities under both the Dollar Rent A Car and Thrifty Car Rental brands. Aff. of Henrietta Berroteran ("Berroteran Aff.") ¶ 3. DTG maintains a facility at the Raleigh-Durham airport ("RDU"). Id. The facility consists of a rental counter and maintenance shop. Id. ¶ 4. The general manager of DTG's RDU facility is Andrew Burks ("Burks"). Aff. of Andrew Burks ("Burks Aff.") ¶ 3. As general manager, Burks oversees all rental transactions, fleet operations and fleet maintenance at the facility. Id. He is responsible for the supervision of all RDU employees and is either involved in or reviews all hiring, termination and disciplinary decisions made with respect to the RDU operation. Id.

DTG considers itself an equal opportunity employer, and has an equal opportunity policy that forbids discrimination on the basis of race, color, sex, age, national origin, ancestry, citizenship, physical or mental disability, religion, marital status, pregnancy, sexual orientation, veteran status, or any other legally protected status. Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") at 3; see Berroteran Aff. ¶ 5. The equal opportunity employment policy applies to all aspects of working at DTG, from hiring through firing, and DTG supervisors and managers are trained regarding compliance with the policy. Berroteran Aff., Ex. A.

DTG hired Plaintiff on December 7, 2006, as a Rental Sales Agent ("RSA"). Berroteran Aff. ¶ 6. Plaintiff signed an acknowledgement of his receipt and understanding of the employee handbook, which contained the equal employment opportunity policy. Dep. of Mohammed Lebyed, July 14, 2009 ("Lebyed Dep.") at 69. As an RSA, Plaintiff's duties were to greet customers, process rentals, respond to

8

customer questions and complaints, and service vehicles for customer rental purposes. Berroteran Aff. ¶ 6.

After Plaintiff spent approximately nine months as an RSA, Burks recommended Plaintiff for promotion to Station Manager Trainee. Id. ¶ 7. The promotion was effective September 17, 2007. Id. The position of Station Manager Trainee is a hybrid one that requires combining the duties of a RSA with those of a Station Manager during the training period. Burks Aff. ¶ 9. As Station Manager Trainee, Plaintiff's increased duties included assisting the RSAs, monitoring and coordinating the fleet of vehicles, and resolving customer and employee relations issues. Berroteran Aff. ¶ 7.

During the training period, on some shifts the trainee works only as an RSA, while on other shifts, the trainee works as both an RSA and a Station Manager. Burks Aff. ¶ 6. Station Manager Trainees at DTG work 50 hours per week, the same number of hours as Station Managers, and their schedules do not contain official breaks. Id. RSAs at DTG work only 40 hours per week, and their days contain two scheduled 15-minute breaks as well as an unpaid half-hour lunch period. Id. Burks is responsible for preparing all Station Manager schedules at DTG's RDU facility, and Station Manager Rahee Sullivan ("Sullivan") creates all RSA Schedules. Burks Aff. ¶ 11. When Plaintiff was promoted from RSA to Station Manager Trainee, Burks prepared his new schedule with input from Sullivan, so that DTG could ensure coverage of the rental counter at all times. Id. According to Burks, Plaintiff's promotion required an increase in work hours from his prior RSA allotment, so that he could learn all new aspects of his new Station Manager position. Id. ¶ 10.

9

Burks and DTG found Plaintiff's performance as Station Manager Trainee generally satisfactory with the exception of one incident that occurred in November 2007, which required intervention by Burks. Burks Aff. ¶ 6. Abderahin Ichols, another DTG employee, filed a complaint with DTG stating that Plaintiff had discriminated against him during a training session by writing a memo to him in Arabic and by yelling at him. Id.; Lebyed Dep. at 17; Berroteran Aff. ¶ 8. Burks received a copy of Ichols's complaint and met with Plaintiff and Ichols. He requested that Plaintiff apologize to Ichols but did not institute any formal disciplinary proceedings. Burks Aff. ¶ 6. Burks stated in his affidavit that he met with Plaintiff because he was identified by Ichols, "another Moroccan," as the alleged discriminator. Id.

At one particular management meeting sometime in mid-November 2007, Plaintiff stayed afterwards in Burks's office to discuss Dollar Thrifty benefits and also the requirements for opening a location in a different country. Pl.'s Am. Compl. ¶ 9. Burks asked where Plaintiff was interested in opening a location and when Plaintiff told him "my home country of Morocco," Burks replied, "[w]hat are you going to rent to the people, camels?" Id. According to Burks, it was Plaintiff who joked about renting camels. Burks Aff. ¶ 7. In spite of this conversation, and the Ichols incident, Burks denied having knowledge of Plaintiff's national origin until Plaintiff filed his discrimination claim. Id. ¶ 5.

Plaintiff was terminated on January 16, 2008, for failure to secure company assets in connection with the theft of a rental vehicle from the RDU property on December 14, 2007, during Plaintiff's shift. Def.'s Mem. at 5. Only Plaintiff and one RSA were working at RDU that day. Id. All employees are responsible for securing and

10

monitoring the company's fleet of vehicles. Burks Aff. ¶ 19. Two customers arrived at the counter and inquired about upgrading to a larger rental vehicle. Lebyed Dep. at 139. The customers wished to look at some vehicle options, so Plaintiff took them to the "cleaning and servicing bay" to look at a burgundy Chrysler Pacifica. Id. The customers agreed to rent this particular car, and Plaintiff instructed the service employee to finish cleaning it and then to pull it around to the front of the facility. Id. at 140. When Plaintiff and the customers returned to the counter and Plaintiff attempted to process their rental, he discovered that they were on the "do not rent" list because they had previously failed to timely return a vehicle. Id. at 141-43. While Plaintiff researched the issue to determine whether he could clear the customers for rental, the service employee brought the vehicle around to the front of the facility and left it there, unsecured and running. Id. at 140-43. Although he knew it was sitting out front unattended, Plaintiff did nothing to secure the vehicle once it arrived, but instead continued to reconcile the customers' "do not rent" status. Id. at 143; Burks Aff. ¶ 19.

Plaintiff ultimately determined that DTG would not permit these particular customers to rent and turned them away from the counter. Lebyed Dep. at 144; Burks Aff. ¶ 14. He took no action with respect to the Pacifica, which was still running in front of the facility. Id. Sometime thereafter, Plaintiff, at the request of a co-worker, opened the security gate to allow another customer to leave the premises. Lebyed Dep. at 80-84. While the gate was open, the Pacifica, which had been left running and unattended in front of the facility for over an hour, was driven off the lot. Burks Aff. ¶ 19. The entire episode was video recorded. Id. ¶ 16.

11

Plaintiff did not report the vehicle as missing the day it was stolen. Lebyed Dep. at 138. In fact, the theft went unnoticed until a fleet reconciliation in January 2008. Burks Aff. ¶ 15. The reconciliation prompted DTG employees to review the video surveillance from December 14, 2007. Id. As a result of the video review, the RDU Fleet Manager, Gerry Foster, met with Plaintiff on January 11, 2008, to discuss the circumstances of the disappearance of the Pacifica. Burks Aff. ¶ 15. Plaintiff could not explain why he opened the gate and allowed the Pacifica to exit the lot; he denied any involvement in the theft. Lebyed Dep. at 81; Burks Aff. ¶ 15. Plaintiff was suspended pending further investigation. Burks Aff. ¶ 15.

Burks spoke with relevant witnesses, looked into Plaintiff's transaction with the two "do not rent" customers, and reviewed the documentary evidence. Burks Aff. ¶ 18. On the basis of what he saw and learned, he determined that Plaintiff had failed to secure company assets by leaving the Pacifica running outside the facility and pressing the button to let the car out the security gate. Id. As a result, on January 14, 2008, Burks requested permission to terminate Plaintiff for failure to secure company assets, which is a violation of company policy. Id. The DTG Human Resources manager approved the termination effective January 16, 2008. Id. Foster, who is white, was also terminated in connection with the theft of the Pacifica, for failure to timely report the incident to the authorities. Id.

On January 14, 2008, DTG reported the stolen vehicle to the RDU police, according to company policy. Aff. of Michael Tyndall ("Tyndall Aff.") ¶ 3. Detective Tyndall spoke with several DTG employees, reviewed the video surveillance and attempted to interview Plaintiff, but Plaintiff refused to speak with him. Tyndall Aff. ¶¶ 3-

12

5. Tyndall then determined that there was probable cause for believing that Plaintiff was somehow involved in the disappearance of the Pacifica, and signed a warrant for Plaintiff's arrest. Id. ¶¶ 6-7. The charges were dropped, however, after Plaintiff took and passed a polygraph test. Id. ¶ 6; Lebyed Dep. at 134.

## B. Discussion

### 1. Summary Judgment Standard

The Court grants summary judgment when it finds that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In performing this analysis, the Court must view the facts and the inferences drawn from them in the light most favorable to the nonmoving party. Springs v. Nicholson, 581 F. Supp. 2d 744, 747 (E.D.N.C. 2008). For the Court to find that no genuine issue of material fact exists, it has to decide that no rational trier of fact could find for the nonmoving party. Perini Corp. v. Perini Constr., 915 F.2d 121, 123-124 (4th Cir. 1990); Anderson, 477 U.S. at 252. The purpose of Rule 56(c) of the Federal Rules of Civil Procedure is to weed out claims devoid of factual bases, requiring a grant of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotrex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Further, the mere existence of some alleged dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 248.

### 2. Discrimination Claims

13

Plaintiff alleges three distinct discrimination-based activities in his complaint: (1) that DTG created a racially hostile work environment because of his race and national origin;[1] (2) that he received disparate treatment on account of his race and national origin; and (3) that he was wrongfully discharged because of his race and national origin. Pl.'s Am. Compl. [DE-29]. Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiffs can prove that they have been subject to discrimination with direct evidence of such discrimination or, if no such direct evidence exists, they can employ the burden-shifting framework first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), which enables plaintiffs to prove discrimination on the basis of circumstantial evidence. See Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006). According to the McDonnell Douglas approach, first the plaintiff must establish a prima facie case of discrimination. 411 U.S. at 802. Once a prima facie case has been made, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for its action. Id. at 802-03. If the defendant satisfies this requirement, the burden shifts back to the plaintiff to provide "sufficient evidence to find that the employer's asserted justification is false." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000); see McDonnell Douglas, 411 U.S. at 804. Proving a prima facie case requires demonstrating different elements depending upon the specific discrimination claim

---

[1] Because the court recommends granting Defendant's Motion to Dismiss with regard to Plaintiff's claim of religious discrimination for failure to exhaust administrative remedies, the summary judgment discussion is limited to Plaintiff's claims of discrimination based on race and national origin.

14

asserted. Since Plaintiff has alleged three bases for his overall claim, each is addressed separately.

## a. Plaintiff Fails to Establish Prima Facie Case for Hostile Work Environment

To establish a prima facie case for a hostile work environment claim, a plaintiff must be able to demonstrate that a reasonable jury could find the harassment: "(1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere;" and (4) imputable to the employer. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001); see also Askew v. Methodist Home for Children, No. 2:07-CV-53-BR, 2009 WL 700601, at *5 (E.D.N.C. Mar. 10, 2009). Defendant disputes that Burks's alleged statement regarding renting camels in Morocco was unwelcome. Def.'s Mot. Summ. J. at 19-20. When Plaintiff was asked at his deposition whether he thought Burks's statement was derogatory, Plaintiff responded affirmatively. Lebyed Dep. at 58. He further stated that he did not consider the statement to be discriminatory or offensive at the time it was made, but so concluded only later in the context of his arrest. Id. Even assuming arguendo that the comment was unwelcome, Plaintiff failed to establish the third and fourth elements of a hostile work environment claim.

With respect to the second element of the test—determining whether an employer was aware that an employee was a member of a protected class—courts consider an employer's "reasonable belief." Greene v. Swain County P'ship for Health, 342 F. Supp. 2d 442, 451 (W.D.N.C. 2004). "Reasonable belief," in this context, hinges on "'some objective evidence' consisting of 'physical appearance, language, cultural activities, or associations, so long as [it] lead[s] the employer to believe that a given

15

employee is a member of a protected class[.]'" Id. at 451 (internal citations omitted). In Greene, the court found that even though defendants offered evidence that plaintiff was not a member of a protected class, plaintiff's assertion to defendant that she was a member of a protected class was "sufficient to show that the [d]efendants had a basis to reasonably believe she was a member of a protected class." Greene, 342 F. Supp. 2d at 451.

Burks states in his affidavit that he was not aware that Plaintiff was Arab and Moroccan until Plaintiff filed this action. Burks ¶ 5. Plaintiff challenges that contention, citing to Burks's statement in his affidavit, "I met with [Plaintiff] because he was specifically identified by Ichols, another Moroccan, as the alleged discriminator." Id. at ¶ 6. The affidavit was taken on July 24, 2009, as part of this litigation. This particular statement provides no guidance as to whether Burks knew at the time of the incident whether Plaintiff was Arabic and Moroccan. It makes clear only that on July 24, 2009, he knew that Plaintiff was Moroccan. Ichols claimed in his complaint that Plaintiff discriminated against him by writing a memo in Arabic. Further, Plaintiff conversed with Burks about opening a branch in his home country, Morocco, the conversation that led to the allegedly discriminatory camels comment. The Court believes that this is sufficient "objective evidence" for Plaintiff's employer to have a reasonable belief that he was a member of a protected class, and moves on to the next step of the analysis.

To succeed on a hostile work environment claim, a plaintiff must also demonstrate that that the harassment was "sufficiently severe or pervasive to alter the conditions of employment and to create a hostile work environment." Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001). The Fourth Circuit employs

16

a four-factor test to evaluate the totality of the circumstances surrounding alleged discriminatory behavior: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work performance; and (5) what psychological harm, if any, resulted." Connor v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir. 2000). Importantly for this Court's evaluation, "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." Harris v. Forklift Sys, Inc., 510 U.S. 17, 21 (1993) (internal quotations omitted). As the Fourth Circuit said, "Title VII is not a federal guarantee of refinement and sophistication in the workplace." Hartsell v. Duplex Prod., Inc., 123 F.3d 766, 773 (4th Cir. 1997). Further, "an isolated racial remark, even though offensive and entirely inappropriate, does not establish an abusive working environment." Williams v. Prince Georges County Hosp. Ctr, 932 F. Supp. 687, 689 (D. Md. 1996).

Here, construing evidence in the light most favorable to the non-moving party, Plaintiff pointed to one instance in which he was subjected to an inappropriate comment. Specifically, Plaintiff's supervisor suggested that he could go into business renting camels in Morocco, as opposed to cars. This statement falls well short of the type of harassment required to establish a prima facie claim for hostile work environment and is insufficient to survive summary judgment. See Jordan v. Alternative Res. Corp., 458 F.3d 332, 340 (4th Cir. 2006) (concluding that a "singular and isolated exclamation," albeit "unacceptably crude and racist," was not sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere).

17

Having failed to demonstrate harassment sufficiently severe and pervasive for Title VII purposes, the Court concludes that Plaintiff's hostile work environment claim cannot withstand Defendant's motion for summary judgment.

### b. Plaintiff Fails to Establish Prima Facie Case For Disparate Treatment

In order to establish a prima facie case for discrimination based on disparate treatment under Title VII, a plaintiff must demonstrate "(1) that [he or she] engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against him were more severe than those enforced against the other person." Lightner v. Wilmington, 545 F.3d 260, 264-65 (4th Cir. 2008) (internal quotations omitted). In considering whether a plaintiff's conduct is similar to that of another, there is no need for "precise equivalence in culpability between employees;" instead the acts must be of "comparable seriousness." Moore v. City of Charlotte, 754 F.2d 1100, 1107 (4th Cir. 1985). Other factors to consider in determining whether individuals are similarly situated are the employees' work histories, whether they engaged in similar conduct, were subject to the same or similar standards, or had the same supervisor, as well as any difference in mitigating circumstances. Cook v. CSX Transp. Corp, 988 F.2d 507, 512 (4th Cir. 1993); Peele v. Country Mut. Ins. Co., 288 F.3d 319, 330 (7th Cir. 2002).

Here, Plaintiff has failed to show the requisite similarity in conduct resulting in disparate punishment. He contends that he was treated differently from other employees at DTG because his work schedule increased by ten hours when he was promoted from RSA to Station Manager Trainee. Lebyed Dep. at 14. There were no other Station Manager Trainees working at the RDU facility with Plaintiff, accordingly,

18

there is no employee similarly situated with which to compare his schedule. However, Station Manger Trainees are scheduled to work for the same number of hours as Station Managers. Burks Aff. ¶ 9. RSAs, which are non-exempt employees, however, are scheduled to work 40 hours per week with two scheduled 15-minute breaks and a 30-minute unpaid lunch period. Id. Station Manager Sullivan created the schedules for all of the RSAs, while Burks created all Station Manager schedules, as well as Plaintiff's work schedule. Lebyed Dep. at 43-44; Burks Aff. ¶ 11. Therefore, Plaintiff's job differed from that of the RSAs and the RSAs had a different supervisor who created their work schedules. As a result, Plaintiff cannot attempt to draw a comparison between his work schedule at that of the RSAs for his disparate treatment claim, because the purported comparison is too loose. See Lightner, 545 F.3d at 265 (noting that employees who held different positions were not similarly situated such that they could be compared for a disparate treatment claim under Title VII).

In addition, Plaintiff claims that he was singled out by being forced to meet with Burks after Ichols complained that Plaintiff was discriminating against him. However, Burks stated that he had a duty to investigate the discrimination allegations. Burks Aff. ¶ 6. In addition, Plaintiff has failed to provide evidence that others who were accused of wrongdoing at DTG were treated more leniently.

While the Court will consider Plaintiff's dismissal in the context of his discriminatory discharge claim, it merits evaluation under the disparate treatment theory as well. Plaintiff asserts that he was treated differently because he was fired after a vehicle was stolen while Plaintiff was working and because Burks made false statements about him to the police. Lebyed Dep. at 14. However, he has failed to

19

identify similarly situated employees who were not fired for failing to secure company assets when vehicles were stolen while they were working. See Carter v. Ball, 33 F.3d 450, 461 (4th Cir. 1994) (concluding that the plaintiff failed to establish a prima facie case of disparate treatment because the plaintiff failed to present evidence that similarly situated employees were being disciplined more leniently for similar conduct). To the contrary, Defendant identified another employee, a Caucasian man who was the "Fleet Manager" on duty who was also fired for the same incident as Plaintiff. See Brewer v. Dana Corp. Spicer Heavy Axle Div., 205 F. Supp. 2d 511, 519-20 (W.D.N.C. 2002) (holding that a plaintiff in a protected class failed to establish a prima facie case of disparate impact where Caucasian employees were terminated for violating the same rule that the plaintiff violated).

Because Plaintiff has failed to provide evidence that he was treated more harshly than any other employee who was similarly situated, Plaintiff has failed to allege facts sufficient to survive Defendant's motion for summary judgment with respect to his disparate treatment claim.

### c. Plaintiff Fails to Establish Prima Facie Case For Wrongful Discharge

The last of Plaintiff's three Title VII claims is for discriminatory discharge. Plaintiff claims that he was fired because he was a member of a protected class. In order for a plaintiff to establish a prima facie case for discrimination under Title VII on the basis of discriminatory discharge, the plaintiff must demonstrate: "(1) that [he] is a member of a protected class; (2) that [he] was qualified for [his] job and [his] job performance was satisfactory; (3) that, in spite of [his] qualifications and performance, [he] was fired; and (4) that the position remained open to similarly qualified applicants after [his] dismissal."

Karpel v. Inova Health Sys. Serv., 134 F.3d 1222, 1228 (4th Cir. 1998) (internal quotations omitted).

Claimant satisfies the first prong of the analysis. He is Arab and from Morocco, claiming discrimination based on his race and national origin; accordingly he is a member of a protected class. See Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007) (noting that the plaintiff, as an African-American man, was a member of a protected class). Nonetheless, Plaintiff fails to make out a prima facie case with respect to his wrongful discharge claim because he cannot show that his job performance was satisfactory. See Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 517 (4th Cir. 2006) (concluding that a plaintiff failed to show satisfactory job performance because he had been reprimanded and given instruction on how to improve, which he failed to follow).

When a plaintiff makes serious errors on the job, he fails to satisfactorily discharge his professional duties. See Purchase, 539 F. Supp. 2d at 828 (concluding that the plaintiff failed to show that her job performance was satisfactory when she consistently submitted work that was riddled with errors, continued to require assistance with routine tasks and caused delays with her mistakes). In addition, courts are clear that when it comes to evaluating whether an employee performed satisfactorily, "it is the employer's perception of job performance, and not the employee's perception, that is controlling." Evans v. Tech. App. & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996).

In this case, Plaintiff was let go from his position for failure to secure company assets by letting a vehicle sit unaccompanied outside the RDU facility and for opening the gate release button, which allowed the vehicle to be stolen from the lot. Failure to

21

secure company assets is a violation of DTG policy. Burks Aff. ¶ 20. All employees at Defendant's facility are responsible for securing and monitoring the vehicle fleet. Id. ¶ 19. Accordingly, Plaintiff cannot establish that he satisfactorily performed his job duties. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) (holding that the plaintiff failed to establish a prima facie claim of wrongful discharge because there was evidence of the plaintiff's poor performance and his supervisor's concerns in the record). The fact that Plaintiff did not believe that his conduct merited dismissal and that he had nothing to do with the theft of the vehicle is not relevant. See Evans, 80 F.3d at 960-61 (noting that the perception of the decision-maker is the relevant inquiry, not that of the employee).

Even assuming, arguendo, that Plaintiff's job performance was satisfactory, he fails to meet the fourth requirement of the prima facie case analysis in that he has presented no evidence that he was replaced by an employee outside his protected class. See Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998) (noting that the plaintiff failed to establish a prima facie case because the evidence was insufficient to show that the employer filed the plaintiff's position with someone outside of the protected class). In order to succeed in demonstrating this element, he would have had to provide evidence either that his replacement was outside the protected class or that a similarly situated employee was not fired under the same circumstances. Id. As noted above, Plaintiff has not provided any such evidence. On the contrary, we know only that a Caucasian employee who was also deemed responsible for the theft of the Pacifica was fired for failure to secure company assets.

Because Plaintiff cannot demonstrate satisfactory job performance or that he was replaced by an employee outside his protected class, he has failed to make a prima facie case for discrimination and has failed to establish that there is a genuine issue of material fact sufficient to withstand Defendant's motion for summary judgment with respect to his discriminatory discharge claim.

## III. Conclusion

The Court **RECOMMENDS** as follows:

(1) that Defendant's motion to dismiss [DE-43] on the basis of failure to adhere to the filing deadlines be **DENIED**;

(2) that Defendant's motion to dismiss [DE-43] with respect to the Title VII claim of religious discrimination be **GRANTED**;

(3) that Defendant's motion to dismiss [DE-43] with respect to the Title VII race and national origin claims be **DENIED**; and

(4) that Defendant's Motion for Summary Judgment [DE-48] be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the

23

proposed factual findings and legal conclusions not objected to, and accepted by, the

District Court.

This the 22nd day of January, 2010.

DAVID W. DANIEL
United States Magistrate Judge